# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 26, 2013 Session

## STATE OF TENNESSEE v. CHARLES CLEVENGER

**Direct Appeal from the Criminal Court for Knox County**
**No. 94790      Jon Kerry Blackwood, Judge**

---

**No. E2012-01119-CCA-R3-CD - Filed June 7, 2013**

---

The appellant, Charles Clevenger, was convicted in the Knox County Criminal Court of two counts of aggravated robbery, one count of felony evading arrest, three counts of misdemeanor simple possession, three counts of felony simple possession, possession of a legend drug, failure to obey a traffic control device, and violation of the financial responsibility law. After a sentencing hearing, he received an effective forty-year sentence. On appeal, the appellant contends that the evidence is insufficient to support the aggravated robbery convictions, that the trial court erred by ruling he could be impeached with prior convictions if he decided to testify, and that some of his convictions violate double jeopardy protections. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the evidence is insufficient to support the appellant's conviction for aggravated robbery by violence and that the conviction must be reversed. Moreover, we conclude that his convictions for misdemeanor simple possession of oxycodone, felony simple possession of oxycodone, and possession of a legend drug are multiplicitous with his remaining aggravated robbery conviction. Therefore, those three convictions are vacated and the charges are dismissed. The appellant's remaining convictions and resulting effective forty-year sentence are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are
Affirmed in Part, Reversed in Part, and Vacated in Part.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Bruce E. Poston, Knoxville, Tennessee, for the appellant, Charles Clevenger.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Takisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual Background

This case relates to the robbery of the Walgreens pharmacy at the intersection of Kingston Pike and Peters Road in Knoxville on March 5, 2010. In June 2010, the Knox County Grand Jury indicted the appellant for the following offenses: count 1, aggravated robbery by violence and accomplished with a deadly weapon, and count 2, aggravated robbery by causing fear and accomplished with a deadly weapon, Class B felonies; count 3, evading arrest creating a risk of death or injury to innocent bystanders, a Class D felony; count 4, simple possession of diazepam, count 5, simple possession of propoxyphene, and count 6, simple possession of oxycodone, Class A misdemeanors; count 7, simple possession of diazepam with two prior convictions for simple possession, count 8, simple possession of propoxyphene with two prior convictions for simple possession, and count 9, simple possession of oxycodone with two prior convictions for simple possession, Class E felonies; and count 10, possession of a legend drug, count 11, failure to obey a traffic control device, and count 12, violation of the financial responsibility law, Class C misdemeanors. Counts 1 and 2 alleged that the victim of the aggravated robbery was Willis Aytes, the Walgreens pharmacist. After the reading of the indictment at trial, the appellant announced guilty pleas to counts 4, 5, 6, 10, 11, and 12. The trial proceeded on the remaining counts.

Prior to the first witness's testimony, the State played an audio-recording of a 911 call made by Walgreens manager Sheri Smith. During the call, Smith informed the dispatcher that someone was robbing the pharmacy. The dispatcher asked if Smith could see any weapons. At first, Smith said she could not see the robber because he was at the consultation window. She then described the robber as white male, having brown hair and a mustache, and wearing a black leather jacket. She said he was wearing pantyhose over his head and had his hands in his pockets so that she could not see whether he had a weapon. She told the dispatcher that the robber was about five feet, eleven inches tall and was wearing latex gloves. She reported that he ran out of the store and toward Peters Road.

Mary McCrackin testified that on the night of the robbery, she was working as the store's senior certified pharmacy technician. McCrackin worked from 3:00 p.m. to midnight, and she worked with pharmacist Willis Aytes, whose shift began at 10:00 p.m. Sheri Smith was the manager on duty. McCrackin explained that the pharmacy's OxyContin was kept in a locked, glass cabinet behind the counter and that customers could not see the cabinet. She said that only the pharmacist had access to the drugs in the cabinet and that any opened bottle in the cabinet was marked with an "X" for inventory purposes and to let everyone in the pharmacy know that the bottle was not "a full stock bottle."

McCrackin testified that while she was working, she noticed a man "out of the corner of [her] eye." He was standing at the pharmacy's drop-off window. McCrackin glanced at the man, who turned out to be the appellant, and saw that he had pantyhose pulled over his face. McCrackin said she thought the appellant was a "prankster." However, he walked toward her, told her to "[c]ome here," and handed her a note. At that point, McCrackin knew the appellant was robbing the pharmacy. McCrackin said that she looked at the note but that it was "really scribbled up" and that all she could read was "'O-X-Y.'" McCrackin told the appellant that she had to get the pharmacist. She handed the note to Aytes, crouched down by the drive-through window, and called 911.

The State played McCrackin's audio-recorded 911 call for the jury. McCrackin whispered to the dispatcher that the pharmacy was being robbed. She told the dispatcher that the robber was wearing a leather jacket and could be Hispanic. She said he was standing at the drop-off window but moved toward the pick-up window.

McCrackin testified that while she was on the telephone with 911, she could hear the appellant yelling at Aytes and Aytes yelling back at the appellant. The appellant kept yelling for Aytes to "hurry up" and told Aytes that he "needed his medicine." McCrackin said that Aytes was yelling back at the appellant, "'I'm trying. I'm working on it. I'm hurrying.'" McCrackin said that she heard a "rattling" noise at the scanners by the drop-off window and that she thought the appellant was trying to get into the pharmacy. She then heard Aytes tell the appellant, "[H]ere." She said that she knew Aytes had given the appellant something and that she did not hear the appellant anymore. The State showed McCrackin the note that the appellant had given to her and that she had given to Aytes and asked her to read it for the jury. She stated, "I can read now it says, 'I want you,' and I see, 'O-X-Y'. I can make out 'OxyContin and no hurt. Hurry, else.'"

The State played a video recording of the robbery for the jury. The video, recorded from inside the pharmacy, showed pharmacist Willis Aytes toward the bottom of the screen and talking on the telephone near the pick-up window. At the top of the screen, the appellant's arm reached through the drop-off window and pushed objects on the counter. Aytes hung up the telephone, walked away from the camera, and walked toward the drop-off window at the stop of the screen. The pharmacist turned toward the drop-off window as if he was speaking to the appellant. While the video was playing, McCrackin explained to the jury that Aytes was talking to the appellant at the drop-off window and that "[t]hat's when [the appellant] was yelling for him to hurry up." Aytes then walked away from the drop-off window and toward the pick-up window at the bottom of the screen. He was holding a white piece of paper. He stopped for several seconds to read the paper, put it on the pharmacy counter, and looked back toward the drop-off window. He walked between the pharmacy shelves and disappeared from view. Shortly thereafter, the appellant appeared at the pick-up

window with his right hand in his right jacket pocket. He leaned into the window briefly and looked around the pharmacy. Then he put his left hand in his left jacket pocket and waited at the window for Aytes, who brought two bottles to the window and put them on the counter. The appellant took his hands out of his pockets, picked up the bottles, and left the window.

On cross-examination, McCrackin testified that the appellant kept his hands in his pockets and that she never saw him with a weapon. She said that he was not nervous and that he was "very firm" when he spoke to her. She acknowledged that she could not see him for a period of time; that he walked to the pick-up window; and that Aytes "[threw] down" onto the counter two OxyContin bottles, which were marked with an "X." The appellant picked up a bottle with each hand; he was not carrying a weapon in his hands. McCrackin acknowledged that Aytes was "pretty cool, calm, and collected" during the robbery and that the video-recording of the robbery showed the appellant did not have a weapon in his hands when he entered or exited the store.

On redirect examination, McCrackin testified that although the appellant's hands were in his pockets during the robbery, she had "no idea what was in his pockets" and was scared for her life and the lives of everyone in the store. She said Aytes had been robbed several times prior to this robbery and was "very calm and collected." Although the appellant did not climb across the pharmacy counter, the video showed his hand reaching across the counter and into the pharmacy.

Daniel Johnson testified that on March 5, 2010, he was working the third shift at Walgreens and was in the office with the manager. He said that they were "doing our end of day stuff" and that he heard another male employee "call a code 0, which is to let us know somebody's in the store that's, you know, suspicious or something." Johnson said that he knew the manager was going to call the police and that he walked toward the pharmacy because he "figured that's where the problem was." The appellant was at the drop-off window and was yelling at the pharmacist to give him pills. Johnson said he was eight to ten feet from the appellant but was "very able to see [the appellant] standing there." The appellant had pantyhose pulled over his face, was becoming agitated, and had his hands in his pockets. The appellant pulled his hands out of his pockets and was holding a closed pocketknife in his right hand. The appellant used his thumb to open the blade, turned toward Johnson, and walked toward him. Johnson said that he was "very very scared" because he did not know what the appellant was going to do and that the appellant "could have been ready to run at me." Johnson held up his hands to let the appellant know he was not threatening the appellant. He said the appellant "held the knife towards me in my direction. So I stepped back for my safety." The State showed Johnson a knife, and he identified it as the one the appellant had during the robbery.

-4-

Johnson testified that the appellant turned his attention back to the pharmacy and began moving aside objects on the pharmacy counter so that Johnson thought the appellant was going to jump over the counter and go into the pharmacy. The appellant was moving back and forth between the pharmacy's drop-off window and pick-up window and was yelling at the pharmacist. The pharmacist was yelling back to the appellant. The pharmacist gave the medication to the appellant, and the appellant ran out of the front of the store. Johnson followed him outside and used his cellular telephone to call 911. He saw the appellant getting into a car and gave the license tag number to the dispatcher. The appellant drove away from the store and pulled onto Peters Road but was slowed by traffic. The police arrived, Johnson pointed to the appellant's car, and the police followed the appellant. Shortly after the robbery, Johnson identified the appellant from a photograph array.

The State played Johnson's 911 call for the jury. Johnson informed the dispatcher that the robber was wearing a black jacket and pantyhose over his face. He reported the appellant's license plate number to the dispatcher and stated that the appellant was stopped at the red light at Kingston Pike and Peters Road. He also told the dispatcher that the appellant had a knife and that the appellant "was holding a knife toward me" during the robbery.

On cross-examination, Johnson testified that the appellant was wearing a black leather jacket. He acknowledged that the appellant threatened him with the knife and that the appellant was nervous. The appellant was still holding the knife while he was moving objects on the pharmacy counter. Johnson acknowledged that the pharmacist had already left the drop-off window by the time the appellant pulled out the knife. However, Johnson said he saw the knife in the appellant's hand while the appellant was "dealing with" the pharmacist. When the appellant left the pharmacy and went toward the front of the store, Johnson could not see whether he was still holding the weapon. Johnson said that he thought the manager also saw the knife and that the knife was black with a white or silver pattern on the blade.

Officer Jason Artymovich of the Knoxville Police Department (KPD) testified that he responded to the robbery and pulled into the Walgreens parking lot with his lights and siren turned on. Witnesses outside the store pointed to the appellant's car, and Officer Artymovich drove to the car to initiate a traffic stop. At first, the appellant acted like he was going to stop for the officer. However, he then "took off." Officer Artymovich pursued the appellant with his patrol car's lights and siren on. The appellant turned from Peters Road onto Parkside and drove through the Turkey Creek area. The appellant traveled through several red lights during the chase, and Officer Artymovich estimated that the appellant's speed was between sixty-five and eighty miles per hour.

Officer Artymovich testified that the appellant turned onto Campbell Station Road and headed east on Interstate 40. He said that the appellant's speed reached 118 miles per hour on the interstate and that "the whole time [the appellant] was swerving around, like, cars." He acknowledged that the appellant's driving endangered other drivers. As the appellant approached the Papermill Road exit, his "passenger tire, it came off, rolled down the interstate." The appellant exited the interstate at Papermill Road with numerous patrol cars pursuing him. The appellant wrecked on a median on Papermill Road. Police officers removed him from his car and handcuffed him. They patted him down and found two pocket knives and a bottle of pills in his pockets. The State showed Officer Artymovich the two knives, one of which had been identified by Daniel Johnson during his direct examination testimony, and the officer identified them as the knives found on the appellant's person. The pill bottle contained tramadol; tramadol hydrochloride; amitriptyline; Valium, also known as diazepam; and propoxyphene.

The State played a video of Officer Artymovich's pursuit of the appellant, recorded from the officer's patrol car. The video showed the appellant traveling through numerous red lights, driving at a high rate of speed, and driving around other vehicles.

On cross-examination, Officer Artymovich acknowledged that the appellant used his turn signal during the chase and that he did not resist arrest. The officer also acknowledged that the police found the knives in the appellant's front pants pockets and that the knives were unusual because they had colored blades.

Beth Goodman, a senior evidence technician with the KPD, testified that she went to the crash scene and photographed the appellant's car. The photographs showed two OxyContin bottles, one of which was clearly marked with an "X," on the driver's floorboard. Part of a latex glove and knee-high hose were on the passenger-side floorboard. In the glove box, police officers found a bottle of alprazolam, a bottle of diazepam, and a bottle of tramadol hydrochloride. The bottles of alprazolam and tramadol hydrochloride were labeled as having been prescribed to the appellant.

At the close of Goodman's testimony, the State rested its case. The appellant did not present any proof. The jury convicted him as charged in count 1, aggravated robbery by violence and accomplished with a deadly weapon; count 2, aggravated robbery by causing fear and accomplished with a deadly weapon; count 3, evading arrest creating a risk of death or injury to innocent bystanders; count 7, felony simple possession of diazepam with two prior convictions for simple possession; count 8, felony simple possession of propoxyphene with two prior convictions for simple possession; and count 9, felony simple possession of oxycodone with two prior convictions for simple possession.

After a sentencing hearing, the trial court merged the appellant's aggravated robbery convictions and sentenced him as a career offender to thirty years in confinement. The trial court sentenced the appellant as a Range III, persistent offender to ten years for the reckless endangerment conviction and ordered that it be served consecutively to the aggravated robbery sentence. The trial court merged the appellant's three misdemeanor simple possession convictions into his three corresponding convictions for felony simple possession and ordered four-year sentences for each conviction to be served concurrently with his aggravated robbery sentence. For the appellant's remaining misdemeanor convictions, the trial court sentenced him to thirty days to be served concurrently with the sentence for aggravated robbery for a total effective sentence of forty years in confinement.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support his aggravated robbery convictions because it fails to show that he used a knife during the robbery. He also contends that the evidence is insufficient to support the convictions because the State failed to prove that he used violence or caused the victim to be in fear. The State argues that the evidence is sufficient. We conclude that the evidence is insufficient to support the appellant's conviction for aggravated robbery by violence in count 1 but that the evidence is sufficient to support his aggravated robbery conviction by causing fear in count 2.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a

combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting State v. Marable, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Aggravated robbery as charged in this case is defined as robbery accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. See Tenn. Code Ann. § 39-13-402(a)(1). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103.

First, the appellant contends that evidence is insufficient to support the aggravated robbery convictions because the State failed to prove that he used a knife during the robbery. We disagree with the appellant. Daniel Johnson testified that he was standing eight to ten feet from the appellant, who was standing at the drop-off window. Johnson said that the appellant pulled a knife out of the appellant's jacket pocket and threatened him with it. Johnson stated that the pharmacist had already left the drop-off window by the time the appellant pulled out the knife. The State showed Johnson one of two knives recovered from the appellant's person shortly after the robbery, and Johnson identified it as the one he saw in the appellant's right hand. The jury, as was its prerogative, obviously accredited Johnson's testimony. Although Mary McCrackin never saw a weapon, she was crouched down by the drive through window during most of the robbery and could not see the appellant. The video also does not show the appellant holding a knife when he arrives at the pick-up window and waits for Aytes to bring the pills to the counter. However, the appellant was out of view for most of the video, including the portion of the robbery where the appellant used the knife to confront Johnson. Taken in the light most favorable to the State, the evidence was more than sufficient for the jury to conclude that the appellant used a knife during the robbery.

Next, the appellant contends that the evidence is insufficient to support the convictions because it fails to show that he used violence or that he caused Willis Aytes, the only victim named in the indictment for the aggravated robbery counts, to be in fear. Regarding the appellant's use of violence, the State argues that the appellant's pulling a knife

on Johnson, implying in his note that someone would get hurt if he did not get the pills, repeatedly yelling at Aytes, and repeatedly telling Aytes that Aytes "better hurry," established his use of violence. As to his causing fear during the robbery, the State contends that it proved that element of the crime through McCrackin and Johnson, who described their fear. The State also contends that the jury could infer Aytes's fear from the appellant's wearing hose over his head, the appellant's threatening note, the appellant's moving objects on the pharmacy counter, and Aytes's surrendering the pills to him.

Our supreme court has defined "violence" as used in the robbery statute as "physical force unlawfully exercised so as to damage, injure or abuse." State v. Fitz, 19 S.W.3d 213, 217 (Tenn. 2000). "While physical contact may rise to the level of violence, physical contact is not required to prove violence." State v. Allen, 69 S.W.3d 181, 186 (Tenn. 2002). For example, "[c]ommon sense dictates that even without physical contact a threat made with a pointed gun is more than just a threat-it is violence." Id.

"Fear" in the robbery statute refers to a "'fear of "bodily danger or impending peril to the person," which intimidates and promotes submission to the theft of the property.'" State v. Dotson, 254 S.W.3d 378, 395 (Tenn. 2008). Fear may be proved by circumstantial evidence, and a victim does not have to testify in order for the State to establish that the victim was in fear. See id. In an aggravated robbery case, "the jury's task is to determine from all of the evidence whether the victim was placed in fear by the conduct of a defendant or should have been under the circumstances." Id. at 396. The determination of whether a victim was in fear, is objective, not subjective. Id. at 395 (Tenn. 2008).

"[T]he elements of 'violence' and 'putting the person in fear' are not mutually exclusive." State v. McKinney, 74 S.W.3d 291, 305 (Tenn. 2002). As our supreme court has explained,

> Pointing a gun at a victim meets both definitions. This construction of the term "violence" does not render meaningless the concept of "putting the person in fear." There remain purely verbal threats and conduct not rising to the level of violence that would place a person in fear. Similarly, conduct that is unperceived by a victim, such as striking a victim from behind to render that victim unconscious, would constitute "violence" but may be insufficient to place that person in fear.

Id.

Turning to the instant case, count 1 of the indictment alleged that the appellant

committed the aggravated robbery of Aytes by violence and accomplished with a deadly weapon. At trial, the State did not call Aytes as a witness and did not attempt to show that the appellant had any physical contact with Aytes. Moreover, there is no evidence that the appellant pointed the knife at Aytes or that Aytes even saw the appellant holding the knife. Although Johnson saw the appellant pull the knife while the appellant was standing at the drop-off window and the video shows Aytes at the drop-off window during the robbery, Johnson testified on cross-examination that Aytes had already left the drop-off window when the appellant pulled the knife out of his pocket. Therefore, we are compelled to agree with the appellant that the proof fails to show violence against Aytes during the robbery and that the evidence is insufficient to support his aggravated robbery conviction in count 1.

Regarding the element of fear, count 2 of the indictment alleged that the appellant committed the aggravated robbery of Aytes by putting him in fear and accomplished with a deadly weapon. Taken in the light most favorable to the State, the evidence shows that the appellant gave a demand note to McCrackin and that McCrackin gave the note to Aytes. The note demanded "O-X-Y," included the word "hurt," and threatened, "Hurry, else." The video shows Aytes speaking with the appellant, who was wearing hose pulled over his head, at the drop-off window; leaving the window; and stopping to read the note. The video shows that Aytes put the note onto the counter and immediately went to get the OxyContin bottles. The appellant demanded that he hurry, and Aytes replied, "'I'm trying. I'm working on it. I'm hurrying.'" Although McCrackin acknowledged on cross-examination that Aytes "[threw] down" the bottles at the pharmacy counter, she did not see Aytes deliver the bottles to the appellant, and our careful review of the video shows him simply putting the bottles onto the counter and quickly stepping away from the counter and the appellant, who picked up the bottles. Although McCrackin testified that Aytes had been robbed three times before and was "calm and collected" during this robbery, a victim's calm demeanor during a robbery does not preclude a finding of fear. Given the facts of this case, we conclude that the jury could have found from the circumstantial evidence that Aytes was or should have been in fear. Therefore, the evidence is sufficient to support his aggravated robbery conviction in count 2.

## B. Prior Convictions

Next, the appellant contends that the trial court erred by ruling that the State could impeach him with prior convictions if he testified. The State argues that the trial court properly ruled that the prior convictions were admissible for impeachment pursuant to Rule 609, Tennessee Rules of Evidence. We agree with the State.

Before trial, the appellant filed a motion in limine to preclude the State from impeaching him with prior convictions. After the State rested its case-in-chief, the trial court

ruled that if the appellant testified, the State could impeach him with two prior felony convictions: a 2005 conviction for aggravated robbery and a 1983 conviction for third degree burglary. As to the prior aggravated robbery conviction, the trial court noted that it was a crime of dishonesty and ruled that it was "highly relevant" to the present case due to the appellant's contention that he did not have a deadly weapon during the Walgreens robbery. The trial court also ruled that the probative value of the prior conviction outweighed its prejudicial effect and that it was admissible for impeachment. As to the third degree burglary conviction, the trial court noted that it too was a crime of dishonesty. The trial court also noted that it was a crime dissimilar to the charged offenses of aggravated robbery. The court found that its probative value on the appellant's credibility substantially outweighed its prejudicial effect and that the conviction was admissible for impeachment. Defense counsel advised the court that many of the jurors had stated during voir dire that they were victims of burglaries; therefore, the prejudicial effect of the appellant's prior burglary conviction would "have a bigger impact than it would in another kind of case." However, the trial court did not alter its ruling, and the appellant made an offer of proof, testifying that he did not display a knife or threaten anyone with a knife during the Walgreens robbery.

Tennessee Rule of Evidence 609(a)(2) provides that the credibility of a witness may be attacked by evidence of a prior conviction if the prior conviction was a felony conviction or involved dishonesty or a false statement. If the witness to be impeached is the accused, "the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 609(a)(3). Rule 609(b) also imposes a time limit on prior convictions, explaining that "evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution; if the witness was not confined, the ten-year period is measured from the date of conviction rather than release." A Rule 609 ruling will not be reversed on appeal absent an abuse of discretion. State v. Mixon, 983 S.W.2d 661, 675 (Tenn. 1999).

The trial court correctly determined that aggravated robbery is a crime of dishonesty, and, therefore, probative of the appellant's credibility. See State v. Stout, 46 S.W.3d 689 (Tenn. 2001) (especially aggravated robbery); State v. Caruthers, 676 S.W.2d 935, 941 (Tenn. 1984) (armed robbery). Although the appellant's prior aggravated robbery conviction is the same as the aggravated robbery charged in this case, given the appellant's denial of the use of a deadly weapon in this case, we agree with the trial court that his prior conviction is highly relevant to his credibility. Therefore, the trial court did not err by ruling that the State could impeach him with the prior conviction. Third degree burglary is also a crime of dishonesty and relevant to the appellant's credibility. See, e.g., State v. Martin, 642 S.W.2d 720, 724 (Tenn. 1982). Moreover, the crime is dissimilar to the current charge of aggravated robbery, reducing the threat of prejudice to the appellant. Although the appellant contends

that several jurors had been the victims of burglaries, increasing the prior conviction's prejudicial effect, the appellant did not include the voir dire transcript in the appellate record. Tenn. R. App. P. 36(a). In any event, we conclude that the trial court did not abuse its discretion by ruling that the State could impeach the appellant with his prior aggravated robbery and third degree burglary convictions if he testified at trial.

In a related argument, the appellant contends that his convictions of misdemeanor and felony simple possession of diazepam in counts 4 and 7, respectively, and of misdemeanor and felony simple possession of propoxyphene in counts 5 and 8, respectively, should be set aside because the trial court's erroneous Rule 609 ruling prevented him from offering his testimony about the charges. He also contends that his convictions in those counts should be set aside because Aytes could have given him the diazepam and propoxyphene with the OxyContin.

Given our conclusion that the trial court properly ruled that the State could impeach the appellant with his prior convictions pursuant to Tennessee Rule of Evidence 609, there is no merit to the appellant's claim that he was improperly prohibited from giving testimony about the offenses in counts 4, 5, 7, and 8. To the extent he is arguing that the evidence is insufficient to support the convictions for those counts, taken in the light most favorable to the State, the evidence shows that the appellant demanded OxyContin, often referred to as oxycodone, from the pharmacist and that the pharmacist gave him two marked bottles of OxyContin. The police found those bottles on the floorboard of the appellant's car. They also found separate bottles containing diazepam and propoxyphene. The evidence is sufficient to support the convictions in counts 4, 5, 7, and 8.

## C. Double Jeopardy

Finally, the appellant contends that his convictions of misdemeanor and felony simple possession of oxycodone in counts 6 and 9, respectively, violate double jeopardy because his taking, and therefore possessing, the oxycodone was an essential element of aggravated robbery. Similarly, the appellant contends that his conviction in count 10 of possessing a legend drug, which Tennessee Code Annotated section 53-10-101(a) generally defines as "any item that federal law prohibits dispensing without a prescription from a licensed doctor," also violates double jeopardy protections because "it is duplicitous to his convictions [for misdemeanor simple possession] in counts 4, 5, and 6." The State argues that the appellant's dual convictions of aggravated robbery and possessing oxycodone do not violate double jeopardy principles and that he has waived his double jeopardy claim as to his conviction of possessing a legend drug. We conclude that the appellant's convictions of misdemeanor simple possession of oxycodone in count 6, felony simple possession of oxycodone in count 9, and possession of a legend drug in count 10, are multiplicitous with

-12-

his aggravated robbery conviction.

Under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." Similarly, article I, section 10 of the Tennessee Constitution states that "no person shall, for the same offence, be twice put in jeopardy of life or limb." The Double Jeopardy Clauses of the United States and Tennessee Constitutions protect an accused from (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense. State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012). The appellant contends that the present case involves the third category, multiplicity.

"Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense." State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996). Multiple convictions for the same offense violate federal and state constitutional prohibitions against double jeopardy. See U.S. Const. amend. V; Tenn. Const. art. I, § 10. In determining whether offenses are multiplicitous, a court should consider the following principles:

> 1. A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;
>
> 2. If each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous; and
>
> 3. Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.

Phillips, 924 S.W.2d at 665 (footnotes omitted). Other factors to consider include "the nature of the act; the time elapsed between the alleged conduct; the intent of the accused, i.e., was a new intent formed; and cumulative punishment." Id.

Turning to the instant case, we initially note that the appellant pled guilty to misdemeanor simple possession of oxycodone in count 6 and possession of a legend drug in count 10. This court has held previously that a double jeopardy claim is not necessarily waived on direct appeal if the convictions were pursuant to a guilty plea. State v. Rhodes, 917 S.W.2d 708, 713 (Tenn. Crim. App. 1995); see also Menna v. New York, 423 U.S. 61, 62 (1975). "[W]hen the double jeopardy claim is apparent from the face of the record, the issue is not waived." State v. David Wayne Phillips, No. M2011-01920-CCA-R3-CD, 2012

Tenn. Crim. App. LEXIS 507, at *7 n.2 (Nashville, July 13, 2012).

The State concedes that the appellant's double jeopardy claim regarding the two possession of oxycodone convictions is apparent from the record but that his double jeopardy claim regarding the possession of a legend drug conviction is not. However, a careful reading of the trial transcript reveals that before the trial court accepted the appellant's guilty pleas, defense counsel stated as follows:

> The count, your Honor, that's OxyContin--possession of OxyContin, I think that has to go on its face, because it is a necessary part of the robbery or agg robbery, whatever you want, 'cause otherwise we'd have an attempt. That's what was stolen. So it's--I think the Court would say double jeopardy to the extent that there--it is a necessary part of the higher crime that's charged, and so the possession of the legend drug OxyContin counts would have to go.

Given that the appellant raised double jeopardy claims as to all three charges in the trial court, the claims are apparent from the face of the record and have not been waived.

The State also contends that this court should refuse to consider the appellant's double jeopardy claim as to the possession of a legend drug conviction because the indictment for that offense did not specify the legend drug at issue. The State argues that because the police found the appellant in possession of numerous drugs, the "legend drug" in the indictment could have referred to any one of them.

During the appellant's double jeopardy argument to the trial court, the State never claimed that the "legend drug" in the indictment referred to any drug other than oxycodone. Therefore, the State inherently conceded that the possession of a legend drug alleged in count 10 referred to the appellant's possession of oxycodone. Moreover, issues raised by the State for the first time on appeal are waived. State v. Adkisson, 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994).

Having concluded that the appellant did not waive his double jeopardy claims, in order for the appellant to have taken the OxyContin from Walgreens during the aggravated robbery, he also had to possess it. The appellant fled from the store, the police immediately located him, and the police immediately gave chase. The police never lost sight of the appellant and arrested him a short time after the robbery. Nothing indicates that the appellant formed a new intent to possess the drug after he committed the robbery intending to take the drug. In sum, the facts of this case do not establish separate incidents to support the

-14-

convictions of possessing oxycodone in counts 6 and 9 and of possessing a legend drug in count 10. Therefore, those three convictions violate double jeopardy protections; the convictions are vacated and the charges are dismissed.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the appellant's conviction of aggravated robbery in count 1 must be reversed because the evidence is insufficient to support the conviction. Moreover, the appellant's convictions of misdemeanor simple possession of oxycodone in count 6, felony simple possession of oxycodone in count 9, and possession of a legend drug in count 10 violate double jeopardy protections because they are multiplicitous with his remaining aggravated robbery conviction. Therefore, the convictions for those three counts are vacated, and the charges are dismissed. The appellant's remaining convictions in counts 2, 3, 4, 5, 7, 8, 11, and 12 and resulting effective forty-year sentence are affirmed.

_____
NORMA McGEE OGLE, JUDGE